JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Edwin Johnson, Jr., appeals his murder conviction following a jury trial. Johnson assigns the following errors for our review:
 "I. The improper admission of `other acts' evidence denied the appellant a fair trial in violation of the Fourteenth Amendment of the Federal Constitution and a new trial must be ordered."
 "II. Prosecutorial misconduct denied the appellant a fair trial in violation of the Fourteenth Amendment of the Federal Constitution."
 "III. It is a violation of the Fifth, Sixth, and Fourteenth Amendments of the Federal Constitution to elicit during the State's case in chief the appellant's failure to deny killing the victim as substantive evidence of guilt."
 "IV. The cumulative errors deprived the appellant of due process in violation of the Fourteenth Amendment of the Federal Constitution."
 "V. The evidence is insufficient to convict the appellant in violation of the Federal Constitution."
 "VI. The appellant's convictions are against the manifest weight of the evidence."
 {¶ 2} Having reviewed the record and pertinent law, we affirm Johnson's conviction. The apposite facts follow.
 {¶ 3} Friends of Brandy Wittenberg last saw her or last heard from her on September 25, 2005. The next day, workers at Kilroy Steel observed a fire on an adjacent vacant property. The police and the fire departments discovered that the burning bag contained a badly burned body, which they later identified as Brandy Wittenberg, the reputed wife of Edwin Johnson, Jr., the mother of his two girls. *Page 3 
 {¶ 4} The coroner determined that Brandy died from cervical compression to the neck. The State concluded someone manually strangled her. Also, the State believed someone stuffed her body into a black garbage bag with a red drawstring, and someone set the bag on fire. That someone, the State surmised, was Edwin Johnson, Jr. The State's theory of the case was that he choked her to death. The State charged him with aggravated murder, kidnapping, tampering with evidence, and gross abuse of a corpse.
 {¶ 5} The subject of this appeal is Johnson's second jury trial. The first trial resulted in a hung jury. In the second trial, Johnson represented himself with the assistance of a court-appointed lawyer. The second jury found him guilty of all charges. The trial court sentenced Johnson accordingly.
 {¶ 6} At trial, the State established that Brandy believed she and Johnson were legally married. Two weeks prior to her death, she told her friend, Sharon Marbury, a State witness, that she wanted a divorce from Johnson because of his affair with Juanita Jones, his co-defendant and co-worker. Regardless, the evidence established that Johnson remained legally married to another woman, Gloria Hall Johnson.
 {¶ 7} Sharon Marbury repeated a conversation she had with Brandy; she stated that Brandy told her that the next time Johnson choked her, he would kill her. Marbury confirmed that Johnson had choked Brandy on many prior occasions. *Page 4 
 {¶ 8} Marbury observed during that conversation that Brandy had red and deep purple bruises on her neck.
 {¶ 9} Several witnesses testified about the events of September 25, 2005; the State believed that this was the date Brandy was murdered. Her longtime friend, Cheryl Kallutz, had on occasions observed bruises on Brandy's neck. Kallutz recalled an occasion, after the police had responded to a domestic dispute at the couple's house, Brandy indicated to Kallutz that while Johnson was beating her, he placed his knees on her chest and choked her.
 {¶ 10} Kallutz stated that on September 25, 2005, Brandy called her and asked her to pick her up at the house. Brandy did not want to be at the house when Johnson arrived to visit with their two girls. This call came at 3:30 p.m. that day. Kallutz told Brandy she would be there in ten minutes. When she arrived, she saw the older daughter playing in the yard with the front door opened. Kallutz thought this unusual. In the past, Brandy would have been sitting on the porch waiting for her to arrive.
 {¶ 11} Kallutz testified that she asked the child where her mother was and the child told her that Brandy was "upstairs laying down with daddy."[1] Kallutz knocked for about two minutes and Edwin Johnson, Jr. appeared at the door. He blocked the *Page 5 
door as he stood with his arms spread across the doorway. Kallutz stated she could not get past him.
 {¶ 12} Johnson told Kallutz that he and Brandy were discussing family matters. He indicated Brandy would call her later. Kallutz described Johnson as sweaty and out of breath.
 {¶ 13} A neighbor, Teresa Rohde, testified about that day as well. She stated that the couple fought constantly. She explained that Johnson choked Brandy a week before that date and the police had ordered Johnson out of the house.
 {¶ 14} Rohde stated that on Sunday, September 25, 2005, at approximately 11:00 a.m., Brandy stopped by to borrow the newspaper. Rohde related that sometime between noon and 4:00 p.m. she heard a disturbance coming from the couple's home. Rohde testified as follows about the ensuing events:
 "* * * Yeah, there was a lot of yelling and screaming. I can't say who was fighting because I did not see Edwin come over, but there was a man and a woman that were arguing next door. And then I heard a loud thump and I heard nothing else."[2]
 {¶ 15} Rohde testified that after she heard the loud thump, she heard the front door open and then close. Rohde stated that she did not see who went out the door. On the day in question, Rohde saw the State's witness, Carmen Long, with Brandy's two children in her car. Rohde also said when she returned that day at about 6:00 p.m., she saw Johnson and Juanita Jones on the front porch. She *Page 6 
found this unusual because Brandy would have been very upset with Juanita at her home.
 {¶ 16} Carmen Long had lived with Johnson and Brandy at one time. She was a co-worker of his and knew Juanita Jones. She related that Brandy was aware of Johnson's affair with Jones. She said that after the police ordered Johnson from the house, he moved in with Juanita Jones. On September 24, 2005, after leaving work, Long and Johnson went to Juanita Jones' home that night. Long testified that at approximately 11:30 a.m. on September 25, 2005, Johnson received a telephone call and he became very upset. After Johnson ended the call, he indicated that he had to go to Brandy's home.
 {¶ 17} Long testified that because she needed to get some things from Brandy's house, she accompanied Johnson. Long stated that Jones also accompanied them. When they arrived, Long and Johnson exited the car, but Jones remained in the car. Long stated that when they entered the house, Brandy was sitting on the floor, in front of a mirror, applying her makeup. Long went upstairs, gathered some clothes from her bedroom, and returned to the car where she and Jones remained. She never saw Brandy leave the house.
 {¶ 18} Sometime later, Johnson exited the house with his daughters and brought them to the car. To Long, Johnson appeared upset, shocked, and was sweating heavily. Johnson gave the girls to her and went back to the house, *Page 7 
accompanied by Jones. Long testified that Johnson and Jones remained in the house for approximately twenty minutes. When Johnson and Jones returned to the car, Johnson looked visibly shocked, scared, and was sweating heavily. Johnson instructed them to take the children someplace to eat. They left and Johnson returned to the house. Jones informed Long that she needed to go to the store and get garbage bags and bleach. Jones took both items to Brandy's house. Long testified that Jones left her presence about 9:00 p.m. with the two items.
 {¶ 19} Jones was an indicted co-defendant and agreed to testify for the State under a plea agreement. She confirmed Carmen Long's testimony and stated on the date in question, Johnson admitted choking Brandy until she became unconscious. She took the garbage bags and bleach to Johnson at 9:00 p.m., and Johnson went upstairs to a bedroom. Around midnight, they left Brandy's home.
 {¶ 20} Lead investigator, Detective Harry Matlock of the Cleveland Police Department, testified that he interviewed Johnson shortly after he was taken into custody. The detective told Johnson that Brandy had been murdered, and Johnson had no visible reaction. Detective Matlock testified that Johnson asked where Brandy's body was found, but not how she was killed.
 {¶ 21} Detective Matlock testified that Johnson related that a week prior to Brandy's death, they had fought. Johnson stated that he choked Brandy to the point where she couldn't breathe, and then he threw her on the couch. Johnson stated *Page 8 
that he and Brandy fought a lot, and admitted that he had choked her on several occasions.
 {¶ 22} Detective Matlock further testified that Johnson indicated that on September 25, 2005, around 3:00 p.m., he arrived at Brandy's house to pick up the children. However, Brandy refused to give him the children, because she thought they were going to be around Jones. The couple began arguing. Johnson stated that while they were arguing, he went into the bathroom; he heard Brandy go down the steps, and out the door.
 {¶ 23} Finally, Detective Matlock testified in pertinent part as follows:
 "Q. Now, at that point in time during this interview did you possess any information that would corroborate that particular point that — — that anyone describes seeing Brandy exit the home Sunday between 3:00 and 4:00 p.m.
 A. Nobody ever sees her leave."[3]
 {¶ 24} On January 30, 2007, the jury returned guilty verdicts on murder, tampering with evidence, and gross abuse of a corpse. On January 31, 2007, the trial court sentenced Johnson to a prison term of fifteen years to life for murder, five years for tampering with evidence, and one year for gross abuse of a corpse. The sentences for tampering with evidence and gross abuse of a corpse were to run concurrently, but consecutive to the sentence for murder. *Page 9 
 Other Acts: "Behavioral Fingerprint" {¶ 25} In his first assigned error, Johnson argues that the other acts evidence presented by the State constituted reversible error. Several of the State's witnesses testified concerning Johnson's choking Brandy, domestic violence incidents, an extra-marital affair, and bigamy.
 {¶ 26} The coroner testified that Brandy's death was caused by cervical compression to the neck caused by manual strangulation. The State's theory of the case was that Johnson killed Brandy by strangling her.
 {¶ 27} This was a purely circumstantial evidence case. No direct evidence as to the perpetrator's identity existed. The State argued it offered these other acts in conformity with the Evid.R. 404(B) modus operandi identity exception.
 {¶ 28} In State v. Lowe,[4] the Ohio Supreme Court held that modus operandi evidence is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint. When the other acts behavioral fingerprint is compared with the behavioral fingerprint associated with the crime in question, this comparison may be used to identify the defendant as the perpetrator. One court has described this permissive comparison as necessary for the jury to address the issue: "whether this crime and the other acts were both committed in X manner, therefore, *Page 10 
they were probably committed by the same person."[5] InDeyling, the court was able to draw a line between permissible identity inference and impermissible character inference. Here, the issue in the case was the identity of the perpetrator. Whoever killed Brandy choked her to death. Johnson had a history of choking Brandy. The jury was correctly allowed to look at the behavioral fingerprint of the other acts and the charged crime, compare them, and draw a permissible identity inference that Johnson probably choked Brandy to death on the day in question.
 {¶ 29} As for the bigamy and infidelity acts, these may properly infer motive under the Evid.R. 404(B) exception. Consequently, we overrule Johnson's first assigned error and hold that the trial court did not abuse its discretion in admitting this evidence.[6]
 Prosecutorial Misconduct {¶ 30} In the second assigned error, Johnson argues he was denied a fair trial due to prosecutorial misconduct. We disagree.
 {¶ 31} A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial.[7] The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is *Page 11 
the fairness of the trial, not the culpability of the prosecutor.[8]
The effect of the prosecutor's misconduct must be considered in light of the whole trial.[9] Furthermore, a prosecutor is afforded wide latitude during closing argument, and it is within the trial court's sound discretion to determine whether a comment has gone too far.[10]
 {¶ 32} In the instant case, Johnson claims the evidence of other acts, extramarital affairs, and bigamy introduced at trial, as well as the State's use of leading questions amounted to prosecutorial misconduct.
 {¶ 33} In the first assigned error, we discussed the propriety of the admission of the other acts evidence as it related to Johnson's practice of choking Brandy. Thus, in this assigned error, we will limit our discussion to Johnson's other claims of prosecutorial misconduct.
 {¶ 34} Within this assigned error, Johnson claims the State's use of leading questions amounted to prosecutorial misconduct. We are not persuaded.
 {¶ 35} The trial judge has discretion to allow leading questions on direct examination. Specifically, Evid.R. 611(C) provides that "leading questions should not be used on the direct examination of a witness except as may be necessary to *Page 12 
develop his testimony."[11] Furthermore, the court exercises reasonable control over the mode of interrogation so that its presentation will effectively ascertain the truth.[12] Therefore, it is within the discretion of the trial court to permit the State to ask leading questions of its own witnesses.
 {¶ 36} Our review of the record indicates that the trial court sustained Johnson's objections each time the State attempted to use leading questions on direct examination of its witnesses. The record also indicates that the trial court, being mindful that Johnson was representing himself, instructed the State not to lead the witnesses, even in instances where Johnson failed to object. The record clearly indicates that the trial court took every measure to ensure that Johnson had a fair trial.
 {¶ 37} Consequently, Johnson was not prejudice by the State's attempted use of leading questions.
 {¶ 38} Within this assigned error, Johnson claims the State improperly elicited opinion testimony that Brandy would not let Juanita Jones, Johnson's girlfriend, into their home, or leave the children around her. We are not persuaded.
 {¶ 39} A review of the record indicates that the allegedly improper opinion testimony was pivotal to rebut Johnson's claim that Brandy just walked down the *Page 13 
steps and out the door, never to be seen again. The record indicates that most of the couple's fights revolved around Johnson's extramarital affairs, and most recently, the affair involving Juanita Jones. Therefore, the alleged improper opinion testimony was necessary to show that Brandy would not have permitted the children to be with Jones, nor permitted Jones to be in the marital home, especially given that Jones was romantically involved with her husband.
 {¶ 40} Within this assigned error, Johnson claims that the State engaged in prosecutorial misconduct during closing argument, by referring to him as a bigamist and a proven liar. We are not persuaded.
 {¶ 41} Generally, prosecutors are entitled to considerable latitude in closing argument.[13] In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom."[14] "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced."[15] *Page 14 
 {¶ 42} In the instant case, the reference to Johnson as a bigamist and a proven liar was based on the evidence presented that Johnson was still married to his first wife, Gloria Hall Johnson, when he obtained a marriage license to marry Brandy. The evidence presented at trial established that Johnson indicated on the application for the marriage license that he was unmarried. The evidence also established that Johnson was still married to Gloria Hall Johnson at the time of trial.
 {¶ 43} We conclude, based on the evidence presented, that the prosecutor's reference to Johnson as a bigamist and a proven liar did not deprive Johnson of a fair trial. In light of the foregoing, we find that the prosecutor did not commit prosecutorial misconduct. Accordingly, we overrule the second assigned error.
 Defendant's Failure to Deny Guilt {¶ 44} In the third assigned error, Johnson argues he was denied a fair trial because the State elicited testimony that he failed to deny to the detective that he killed Brandy. We disagree.
 {¶ 45} In Doyle v. Ohio,[16] the Supreme Court of the United States explained that the Miranda warnings convey an implied assurance to the accused that the state will not use a defendant's silence against him at trial.[17] "Doyle rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be *Page 15 
used against him and then using his silence to impeach an explanation subsequently offered at trial."[18] "Such comments penalize a defendant for choosing to exercise a constitutional right. Prosecutors must therefore take care not to equate the defendant's silence to guilt."[19]
 {¶ 46} In the instant case, Johnson specifically argues that the prosecutor improperly elicited the following testimony from Detective Matlock:
 "Q. Now, did you hear the testimony of Travis Milam and Carmen Long that when they spoke with the defendant during various points in their conversation with them after Brandy's death was discovered that he made a statement, I didn't do it to both Travis and Carmen?
 A. Correct.
 Q. Did he ever make such a statement to you?
 A. Never."[20]
 {¶ 47} Out of context, the State's questions appear to be a blatantDoyle violation. However, the rest of the exchange indicates that the State was inquiring into Detective Matlock's investigative procedures. The above-quoted section continued as follows: *Page 16 
 "Q. During the course of your investigation did you receive documents in connection with the personal affairs of Brandy Wittenberg Johnson?
 A. We conducted a search warrant at 2513 Woodbridge Avenue with the consent of Mr. Johnson, form which he signed and there were documents there on the dining room table that we had secured from the address.
 Q. Detective, the first document that's before you, I believe is State's 152. What was the last item we left off before we get into these?
 A. 152 is the marriage license."[21]
 {¶ 48} The above excerpt, and the continued examination of Detective Matlock indicates that the State was inquiring about the investigative procedure. The record is devoid of any other reference to Johnson's failure to deny killing Brandy when he was interviewed by Detective Matlock. We conclude that the isolated question was not meant to be an insinuation of Johnson's guilt based on his silence. Accordingly, we overrule the third assigned error.
 Sufficiency of Evidence {¶ 49} In the fifth assigned error, Johnson argues his conviction is not supported by sufficient evidence. We disagree.
 {¶ 50} The sufficiency of the evidence standard of review is set forth in State v. Bridgeman:[22] *Page 17 
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."[23]
 {¶ 51} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks,[24] in which the Ohio Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 52} In the instant case, Johnson admitted to Detective Matlock that he was at the marital residence the day Brandy was last seen or heard from. Johnson also admitted that he and Brandy had an argument that day. Johnson then claimed that Brandy walked down the steps, out the front door, and he never saw her again. Carmen Long testified that she saw Brandy when she went with Johnson to the house. Long testified that after gathering some clothes, she went back to sit in the car with Juanita Jones, while Johnson was still inside the house with Brandy. Long testified that she never saw Brandy exit the house. *Page 18 
 {¶ 53} Juanita Jones testified that she drove with Johnson and Long to Brandy's house that day. Jones testified that she waited in the car while Johnson and Long went in the house. Jones testified that after Long returned to the car and she continued to wait for Johnson, she received a telephone call from Johnson indicating that he had choked Brandy and that she looked unconscious. Jones also testified that she never saw Brandy exit the house.
 {¶ 54} Jones also testified that Johnson asked her to buy bleach and garbage bags and bring them to him at Brandy's house. Jones delivered the requested items to Johnson at Brandy's home, and he proceeded upstairs with them. Jones further testified that the following morning, at approximate 4:00 a.m., Johnson left Jones' house after claiming he had to go to the store and to his parent's house. Jones testified that she did not see Johnson until she awoke later that morning.
 {¶ 55} Finally, the coroner determined that Brandy was choked to death and numerous witnesses testified that Johnson had choked Brandy on prior occasions. The foregoing evidence, viewed in a light most favorable to the State is sufficient to establish the elements of the charged crimes. Accordingly, we overrule the fifth assigned error.
 Manifest Weight of Evidence {¶ 56} In the sixth assigned error, Johnson argues his conviction is against the manifest weight of the evidence. We disagree. *Page 19 
 {¶ 57} In State v. Wilson,[25] the Ohio Supreme Court recently addressed the standard of review for a criminal manifest weight challenge, as follows:
 "The criminal manifest-weight-of-the-evidence standard was explained in State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In Thompkins, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387, 678 N.E.2d 541. `When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.' Id. at 387, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652."
 {¶ 58} As discussed in our resolution of the fifth assigned error, Johnson's convictions were based on substantial and sufficient evidence. Several pivotal witnesses placed Johnson at the house on the day Brandy was last seen or heard from. Moreover, Johnson told Jones he had choked Brandy and she looked unconscious. Therefore, Johnson's convictions are not against the manifest weight of the evidence. *Page 20 
 Cumulative Errors {¶ 59} In the fourth assigned error, Johnson argues the cumulative errors denied him a fair trial. We disagree.
 {¶ 60} It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. In order to find "cumulative error" present, we first must find that multiple errors were committed at trial. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors.[26]
 {¶ 61} In previous assigned errors, we addressed specific errors that Johnson alleged deprived him of a fair trial; thus, we will limit our discussion to Johnson's allegations that the trial court erred by admitting circumstantial evidence. We are not persuaded.
 {¶ 62} Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.[27]
Circumstantial evidence and direct evidence inherently possess the same probative value.[28] Thus, proof of guilt may be made by *Page 21 
circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence.[29]
 {¶ 63} In the instant case, we have concluded that the State presented sufficient evidence to support Johnson's convictions. We have also found that Johnson's convictions are not against the manifest weight of the evidence. Accordingly, we overrule the fourth assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, A.J., and COLLEEN CONWAY COONEY, J., CONCUR
[1] Transcript at 64.
[2] Tr. at 64.
[3] Tr. at 1220.
[4] 69 Ohio St.3d 527, 1994-Ohio-345.
[5] State v. Deyling (January 28, 1998), 9th Dist. C.A. No. 2672-M.
[6] State v. Maurer (1984), 15 Ohio St.3d 239.
[7] State v. York, Cuyahoga App. No. 87814, 2006-Ohio-6934; State v.Keenan (1993), 66 Ohio St.3d 402-405; State v. Gest (1995),108 Ohio App.3d 248, 257.
[8] Smith v. Phillips (1982), 455 U.S. 209, 102 S.Ct. 940,71 L.Ed. 2d 78.
[9] State v. Durr (1991), 58 Ohio St.3d 86, 94; Maurer, supra at 266.
[10] State v. Benge, 75 Ohio St.3d 136, 1996-Ohio-227.
[11] State v. Robinson, Cuyahoga App. No. 85207, 2005-Ohio-5132.
[12] Id.; Evid.R. 611(A).
[13] State v. Palmer, Cuyahoga App. No. 87318, 2006-Ohio-4893;State v. Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81; State v.Stevens, 2nd Dist. No. 19572, 2003-Ohio-6249.
[14] State v. Lott (1990), 51 Ohio St.3d 160, 165, quoting State v.Stephens (1970), 24 Ohio St.2d 76, 82.
[15] Ballew, supra; State v. Lorraine (1993), 66 Ohio St.3d 414,420.
[16] (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91.
[17] Id. at 618.
[18] Wainwright v. Greenfield (1986), 474 U.S. 284, 291,106 S.Ct. 634, 88 L.Ed.2d 623, quoting South Dakota v. Neville (1983),459 U.S. 553, 565, 103 S.Ct. 916, 74 L.Ed.2d 748.
[19] State v. Thompson (1987), 33 Ohio St.3d 1, 4.
[20] Tr. at 1230-1231.
[21] Tr. at 1231.
[22] (1978), 55 Ohio St.2d 261, syllabus.
[23] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23;State v. Davis (1988), 49 Ohio App.3d 109, 113.
[24] (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[25] 113 Ohio St. 3d 382, 2007-Ohio-2202.
[26] State v. Djuric, Cuyahoga App. No. 87745, 2007-Ohio-413.
[27] State v. Griesheimer, 10th Dist. No. 05AP-1039,2007-Ohio-837, citing State v. Bentz (1981), 2 Ohio App.3d 352,355.
[28] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus.
[29] State v. Griffin (1979), 13 Ohio App.3d 376, 377. *Page 1